**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BARBARA CLUCK, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:18-cv-56 |
| | : | |
| v. | : | |
| | : | Judge Sarah D. Morrison |
| | : | |
| UNUM LIFE INSURANCE COMPANY | : | Magistrate Preston Deavers |
| of AMERICA, | : | |
| | : | |
| Defendant. | : | |

**OPINION AND ORDER**

This non-ERISA case addresses termination of long-term disability ("LTD")

benefits. Specifically, Plaintiff Barbara Cluck alleges that Defendant Unum Life

Insurance Company of America terminated her LTD benefits in violation of the

applicable disability policy. Cluck further alleges that Unum did so in bad faith. She

moves for summary judgment on the breach of contract claim (ECF No. 40) and

Unum moves for summary judgment on the bad faith count (ECF No. 41). Being

fully advised, the Court **DENIES** Cluck's motion (ECF No. 40), **GRANTS** Unum's

motion (ECF No. 41), and **GRANTS** Unum's Motion to Seal (ECF No. 102).

**I. BACKGROUND**

**A. Initial LTD Approval**

Unum issued a disability policy ("Policy") to The Ohio State University

("OSU"). Because Cluck worked for OSU as a medical assistant, she had disability

insurance coverage under the Policy via her status as an employee of OSU.

According to the Policy:

1

You are disabled when Unum determines that:
- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

You will continue to receive payments beyond 24 months if you are also:
- working in any occupation and continue to have a 20% or more loss in your indexed monthly earnings due to your sickness or injury; or
- not working and, due to the same sickness or injury, are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

(ECF No. 30-1, PageID 292.)[1]

In February 2008, Cluck began experiencing severe back pain and saw Diana Taylor, M.D., her primary care physician. Cluck had an MRI. Dr. Taylor reviewed the results and determined that Cluck had "mild degenerative disk disease

---

[1] On March 8, 2021, the Court ordered Unum to authenticate the claims file (ECF Nos. 30, 109). Counsel thereafter notified the Court that authentication was achieved by ECF No. 41-2.

throughout. No major disk herniation. Some swelling at T8-T9 which is probable cause of her pain." *Id*. at 181. Dr. Taylor indicated that Cluck could not return to work and referred Cluck to Rao Lingam, M.D., a pain management specialist. *Id*. at 178, 189.

Dr. Lingam examined Cluck in March 2008 and determined that she had thoracic degenerative disc disease; thoracic disc bulge; myofascial pain syndrome; and lumbar spondylosis. *Id*. at 190. He prescribed epidural steroid injections, which Cluck had done. *Id*.

Unum began reviewing Cluck's file for LTD benefits in May 2008. *Id*. at 209, 211. Unum requested updated medical records from Dr. Taylor. *Id*. at 215. Dr. Taylor's office notes from May 2008 describe Cluck as having severe back pain after a fall, being unable to get out of bed, and walking with difficultly. *Id*. at 225. Dr. Taylor indicated that Cluck was "unable to sit, stand, walk, push, pull, etc." *Id*. Visit notes from June 2008 indicate that Cluck had two epidural steroid injections in her thoracic area, but none in her lumbar area. The two injections did provide relief to the thoracic area. The notes further state:

> She has constant pain in her L low back, which radiates down the side of her leg. She has a sharp shooting in the first 2 toes of her L foot. She says she gets this shooting pain every time she steps down on her foot. She says she can't even do her housework. She can't carry a gallon of milk. She can't do laundry. She can't reach up to put dishes in the cabinet. She can stand for maybe an hour, but then she has to lie flat to take the pressure off her back.
> O: PE: In general, she is in obvious distress. She prefers to stand. When she sits, she extends her L leg. DTRs are

3

> 2+ in the R knee and ankle; 1+ at the L knee; 0 at the L
> ankle. SLR is positive on the L.
> A: 11 Thoracic and lumbar DDD with L lumbar
> radiculopathy
> P: She will not be ready to return to work on June 11 even
> with restrictions. This would not be possible because she
> can't sit or stand or do any amount of even minimal
> lifting. Continue tx with Dr. Lingham. F/U with me on
> July 2 in 1 month to reevaluate.

*Id*. at 271.

Unum asked Dr. Taylor about Cluck's ability to take part in a transitional

return to work program. *Id*. at 268. Dr. Taylor responded that Cluck "can't stand for

more than a couple hours, but can't sit for more than 1 hour. Can't lift at all. Can't

bend at all. No pushing/pulling at all. Has to lie flat frequently." *Id*. Dr. Taylor

declined to release Cluck to return to work even with restrictions. *Id*.

Unum approved Cluck's LTD benefits for low back pain and radiculopathy on

July 9, 2008. *Id*. at 291. The approval letter, signed by Benae Francis, a Senior

Disability Benefits Specialist at Unum, stated:

> Although we are approving [long-term disability]
> benefits at this time, you must continue to meet the
> definition of disability in your policy in order to qualify for
> ongoing benefits. Medical records indicate you have
> recently had an epidural steroid injection for pain;
> however, there are no significant diagnostic findings to
> support your continued complaints of pain. Should you be
> unable to return to work following your next office visit on
> July 1, 2008, we would expect your physician to order
> additional diagnostic testing with a referral to a
> specialist.
> We will be requesting all updated records following
> your July 1, 2008 office appointment with Dr. Taylor.

*Id*. at 292.

Unum continued to obtain and review Cluck's medical records for the duration of 2008. In October of that year, Dr. Taylor referred Cluck to neurologist Halyna Stechyshyn, M.D., after an MRI revealed normal findings. *Id*. at 566-67. Dr. Stechyshyn assessed Cluck and had Cluck complete a nerve conduction study. *Id*. at 494, 609. The study revealed no peripheral neuropathy or acute radiculopathy. *Id*.

Dr. Taylor's December 2008 visit note provided:

> The pt has been so depressed for the last 3 days that she has hardly gotten out of bed. She says she just gets out of bed to go to the bathroom. She is in tremendous pain and is very upset that she is not able to go to work.

*Id*. at 564. Dr. Taylor referred Cluck to rheumatologist Arthur Armstrong, M.D. for a possible fibromyalgia diagnosis. *Id*.

Dr. Armstrong examined Cluck in early January 2009. *Id*. at 601. His notes indicate that the epidurals did help her pain and further provide that:

> [T]he patient did give signs and symptoms which meets criteria for fibromyalgia. She has 16 trigger points on exam throughout her torso, back, neck, and limbs and she has some fibromyalgia medication at this time including Lyrica and Cymbalta but unfortunately is unable to tolerate higher dose of Lyrica due to skin reaction.

*Id*. at 602. He recommended exercise, physical therapy and a TENS unit.

As a result of the fibromyalgia diagnosis, Margaret Zephier, a registered nurse employed by Unum, was tasked with reviewing Cluck's file. At that point, Cluck was treating with four separate physicians—Taylor, her PCP; Armstrong, her rheumatologist; Lingam, her pain specialist; and Stechyshyn, her neurologist. Zephier concluded that Cluck's fibromyalgia, depression, and inability to afford

physical therapy due to required co-pays supported Cluck's sustained impairment. (ECF Nos. 30-1 and 30-2, PageID 649-654.) Zephier did note that a referral to a therapist would be expected, as cognitive behavioral therapy was a common treatment for fibromyalgia. *Id.*

OSU terminated Cluck in March 2009. At that point, Cluck lost insurance. Dr. Taylor's April 2009 restrictions included no bending, lifting, pushing, or pulling and no standing for more than ten minutes. *Id.* at 752. Dr. Taylor indicated that the restrictions were permanent because Cluck's condition had not improved after more than a year. *Id.* at 752. Dr. Taylor noted that Cluck had trouble grasping and experienced pain just from sitting in a car. *Id.*

Dr. Taylor's May 1, 2009 visit notes provided that Cluck continued to have severe right leg pain and that her right leg frequently "gives out" on her. *Id.* at 760. Dr. Taylor noted that Cluck had not seen Dr. Lingam due to Cluck's lack of insurance. *Id.* Dr. Taylor again stated that Cluck "has not had any improvement in over [one] year . . . ." *Id.*

Because Dr. Taylor identified Cluck's restrictions as permanent, Unum had Charlene Saucier, another registered nurse employed by Unum, review Cluck's file to determine whether the record supported Dr. Taylor's position. *Id.* at 766. Saucier considered office notes from Dr. Taylor and Dr. Armstrong. *Id.* Saucier also read Zephier's January 2009 report. *Id.* Saucier concluded:

> [T]he medical documentation available supports
> the R[estriction]s and L[imitation]s with unable to
> stand/walk more than 10 minutes, cannot bend, lift,
> push/pull, trouble with grasping and pain with sitting in a

> car. The claimant has had persistent back pain unrelieved
> by steroid injections and or pain medications. During the
> physical examination, Dr. Ta[y]lor notes the Claimant has
> difficulty getting up on the exam table, severe pain with
> lying down and sitting up.
>
> Based on the Claimant's history with DDD,
> fibromyalgia, depression, and noted physical activity
> limitations, it is likely these Rs and Ls are ongoing.

*Id*.

On May 21, 2009, Unum sent Cluck a letter stating that Unum was

continuing to review Cluck's eligibility for LTD benefits but informing her that:

> At the present time, you meet the policy definition
> of disability. Based on the facts of your claim as well as
> our clinical review, we do not anticipate a change in your
> medical status and therefore, have made the decision to
> extend our approval of your benefits, for symptoms
> related to the diagnoses of Degenerative Disc Disease and
> Fibromyalgia, through December 29, 2023. * * *
>
> For medical benefits to continue, we must receive
> additional medical information from time to time and as
> necessary to determine your eligibility for benefits. . . .

(ECF No. 35-1, PageID 1813). The letter informed Cluck that: (1) after May 18,

2010, she would be disabled under the Policy only if she was unable to perform any

occupation; and (2) on December 3, 2010 her mental health benefits would

permanently expire. *Id*. at 1814-15.

### B.   Benefit Termination

Unum continued Cluck's benefits without incident through the end of 2014.

In April 2015, Cluck completed Unum's Disability Status Update request wherein

she indicated that:

> Depending on how I'm feeling, I'll wash dishes or do
> laundry, take a shower. Maybe cook something. Read the

> paper for possibly 20 min[ute]s here or there. It's hard to
> sit for long periods of time or lift things. So I don't really
> get on the computer very often. On a good day I might go
> to see my mom or possibly go to church. Still very limited
> in what I can do, or lift, or sit.

(ECF No. 30-3, PageID 1223.) Upon receipt of that update, Unum requested that Dr. Taylor give Unum Cluck's records from January 2014 forward and indicate what Cluck's current restrictions were. *Id.* at 1233. In response, Dr. Taylor provided Cluck's medical records from 2010 forward but did not address Cluck's current restrictions and did not enclose an attending physician's statement. *Id.* at 1237-99.

Dr. Taylor's March 2015 encounter notes indicate that Cluck had obtained insurance through Medicaid and that Cluck needed to have her gallbladder removed. *Id.* at 1245. No mention is made of back pain or fibromyalgia. *Id.* Dr. Taylor described Cluck as in "no acute distress." *Id.*

Unum spoke with Cluck in May 2015. Cluck indicated that her condition had not changed and that she was still having "shooting" pains in in her leg and back. *Id.* at 1306. Cluck said she was only treating with Dr. Taylor. *Id.* Cluck stated a nerve block in her leg had caused her falls to stop. *Id.*

Shortly after the call, Unum referred Cluck's file to Heather Mercier, a nurse at Unum, for a clinical functional capacity review because Cluck had obtained insurance, was only treating with Dr. Taylor, and the basis for Dr. Taylor's restrictions was "unclear." *Id.* at 1308. Unum notified Cluck her LTD claim was under review. *Id.* at 1311.

Unum tasked Mercier with determining whether Cluck had "the functional capacity to perform occasional exertion up to [ten] pounds, performed from a seated position with occasional standing and walking with the ability to change positions as needed on a full time basis[.]" *Id.* at 1327. Mercier reviewed Cluck's file and issued her report on June 11, 2015. *Id.* at 1330. Therein, she highlighted the fact that Cluck had obtained health insurance again. Mercier concluded that Cluck's expressed back pain was "in excess of her imaging and diagnostic findings" and Cluck's treatment of Advil and Percocet for her pain was "inconsistent with severe pain that limited F[unctional] C[apacity]." *Id.* Mercier next addressed Cluck's fibromyalgia. Mercier noted that Cluck had failed to go to physical therapy as ordered even though Cluck had obtained insurance. *Id.* Mercier commented that Cluck's "reports of weakness, gait disturbance and need for a cane" were inconsistent with fibromyalgia symptoms. Turning to Cluck's anxiety and depression, Mercier stated that those conditions were periodic and that Cluck had not recently been prescribed medication for either. *Id.* Mercier further noted that Cluck had not seen a behavioral health specialist even though Cluck had insurance at that point. *Id.* Mercier noted that Dr. Taylor had not provided any restrictions for any of Cluck's conditions despite Unum's request. Mercier stated that Cluck was not treating with any specialists despite the fact that Cluck had obtained insurance. *Id.* Lastly, Mercer wrote that Dr. Taylor told Cluck that Cluck "should consider a part time sit down job." (ECF No. 30-3, PageID 1329; ECF No. 30-2, PageID 1060.)

Mercier concluded that "functional limitations for seated level activities would not be supported" for any of Cluck's conditions. (ECF No. 30-3, PageID 1330.)

Unum also had Norma Parras Potenzo perform a vocational assessment for Cluck. *Id*. at 1334. Potenzo was charged with determining whether Cluck could perform any occupation. On June 17, 2015, Potenzo concluded that Cluck could perform the duties of a General Clerk, Receptionist, and/or Information Clerk. *Id*. at 1336-8.

Unum terminated Cluck's LTD disability benefits on June 22, 2015. The letter informing Cluck of the decision provided:

> Your Long Term Disability claim was approved based on impairment related to low back pain and fibromyalgia symptoms because your medical records supported your inability to perform your occupation as a Medical Assistant.
>
> As of May 18, 2010, the policy defines disability as the inability to perform any gainful occupation for which you are reasonably qualified by way of training, education, and experience. A gainful occupation would be any job that would be expected to provide you with an income of at least $8.75 per hour.
>
> As part of our ongoing claim review process, you completed a Disability Status Update form for us in April 2015. You identified your current treatment provider as being only Dr. Taylor.
>
> Dr. Taylor did not provide a recent comment on your current restrictions and limitations however [she] did provide copies of your medical records from March 2010 through March 26, 2015.
>
> Our clinical staff has completed a review of the available medical information, including the diagnostic testing and office visit notes. Our medical staff agrees that your physical conditions would preclude you from performing the duties of your pre-disability occupation. The records, however would not support that you would be precluded from occasional exertion up to 10 pounds,

performed from a seated position with occasional standing and walking with the ability to change positions as needed on a full time basis.

Dr. Taylor's records reflect that although you have reported continued back pain, numbness in your legs and weakness, your complaints are in excess of your diagnostic findings. Imaging completed was age appropriate and did not demonstrate neuro-compromise. EMG studies were normal. Your office visit notes document physical exam findings within normal limits, including the evaluation of your left leg.

Additionally, severe pain rising to a level to impair one's functional ability would be expected to result in treatment by an orthopedic or neurology specialist or referral to pain management. It is noted that Dr. Taylor has not opined any ongoing restrictions or limitations based on any medical condition.

Although you have been diagnosed with fibromyalgia syndrome, this condition does not result in tissue, organ, or joint damage. You have reported gait instability with the need for a cane. Although inconsistent with diagnostic imaging, it is noted that the use of a cane to walk would not preclude you from performing seated-level activities. This is consistent with Dr. Taylor's historical recommendation that you return to work in a seated capacity.

*Id.* at 1344. The letter further advised Cluck of her right to appeal and of the directions for doing so. *Id.* at 1347.

## C. Cluck's Appeal

Cluck spoke with Unum on June 26, 2015. *Id.* at 1368. Cluck stated that Dr. Taylor did not receive Unum's letter asking for updated restrictions and limitations. *Id.* Unum told Cluck it would fax the request to Dr. Taylor. *Id.* Unum told Cluck to have Dr. Taylor include all notes from Cluck's recent visits. *Id.* Unum faxed the form to Dr. Taylor the same day. *Id.* at 1370.

11

Dr. Taylor returned the completed form to Unum three days later. The form indicated that Cluck's primary diagnosis were lumbar radiculopathy, fibromyalgia, depression, anxiety, and hyperparathyroidism. *Id*. at 1373. Dr. Taylor stated that Cluck was presently experiencing severe low back pain radiating to both legs, weakness, depression, and diffuse pain. *Id*. Dr. Taylor stated that Cluck "can't climb stairs or lift overhead, can't sit for more than 20 minutes. Some days can barely get out of bed. Trouble walking, frequent falls." *Id*. at 1374. The lone referral occurred in April 2015 for a parathyroidectomy. *Id*. Dr. Taylor indicated that Cluck was currently taking Adderall, Cymbalta, Fioricet, ibuprofen, Percocet, and Xanax. *Id*. at 1376.

### 1.  Dr. Hauser's Opinion

After receiving Dr. Taylor's completed form, and despite the fact that Cluck had not filed a formal appeal, Unum asked Daniel Hauser, M.D., an in-house board certified family practitioner, to review Cluck's records to determine whether Cluck had "the functional capacity to perform occasional exertion up to 10 pounds, performed from a seated position with occasional standing and walking with the ability to change positions as needed on a full time basis?" *Id*. at 1412.

Dr. Hauser called Dr. Taylor's office to speak with her about Cluck's file. *Id*. at 1384. After being unable to reach her via telephone, Dr. Hauser proceeded to fax Dr. Taylor a letter stating that Cluck appeared to have the capacity to occasionally lift, carry, push and pull up to ten pounds; sit for most of the workday, and occasionally stand and walk for brief periods of time. *Id*. The letter asked if Dr.

Taylor agreed with those capabilities. *Id*. at 1384. If she did not, Dr. Taylor was asked to list "what symptoms or deficits preclude Ms. Cluck from performing" those restrictions and to detail what treatment visit notes and/or diagnostic test findings corroborated Cluck's symptoms. *Id*. at 1385.

Dr. Taylor's July 13, 2015 response stated that Cluck did not have the ability for the listed demands. Dr. Taylor indicated that Cluck lacked capacity for sitting most of the day and that some days Cluck remained in bed all day. *Id*. at 1391. Dr. Taylor wrote that Cluck's "severe pain in back and down hip and numbness in [her] legs" prevented Cluck from performing Dr. Hauser's listed demands. *Id*. at 1397. Dr. Taylor stated that those symptoms were corroborated by "diffuse tenderness, positive straight leg raise, difficulty even lying down and sitting up for exams." *Id*.

Dr. Hauser reviewed Dr. Taylor's response and Cluck's file dating back to 2008. That included, but was not limited to, consideration of notes, test results, and diagnoses from Dr. Taylor, Dr. Armstrong, Dr. Lingam, and Dr. Stechyshyn. Dr. Hauser concluded that Dr. Taylor's restrictions and limitations were "uncertain." *Id*. at 1408. He characterized Cluck's symptoms as "highly variable" and "not consistent with the diagnosis of fibromyalgia." *Id*. at 1409. He described Cluck's test results as not revealing "severe pathology that would be expected to result in the severe symptoms and extensive limitations reported by" Cluck. *Id*. On July 31, 2015, he concluded that the "extensive limitations reported by [Cluck] [we]re not consistent with or corroborated by physical examination and/or diagnostic test findings." *Id*. Because Cluck was scheduled to have a parathyroidectomy, Dr.

Hauser refrained from issuing his final opinion until he obtained more information from Michelle Wood, D.O., the surgeon who would be performing that surgery. *Id*. at 1412, 1416. Dr. Hauser also requested updated information from March 2015 forward from Dr. Taylor. *Id*. at 1454.

On August 20, 2015, Cluck filed her formal appeal of Unum's decision terminating her LTD benefits. *Id*. at 1432.

Dr. Taylor sent Unum updated records on August 26, 2015. Visit notes from April of that year provide that Cluck "is in no acute distress." *Id*. at 1471. Dr. Taylor's May 18, 2015 visit notes state that Cluck had less fibromyalgia pain after re-starting Cymbalta. *Id*. at 1469. Cluck saw Dr. Taylor one week later after falling from a landing. *Id*. at 1467. As a result of the fall, Cluck's back was hurting and the pain was radiating down the back of her left leg. *Id*. Dr. Taylor stated that Cluck was "in obvious distress and "tender" everywhere Dr. Taylor examined. *Id*. Dr. Taylor diagnosed Cluck with lumbar strain and exacerbation of fibromyalgia, prescribed Percocet, and advised Cluck it could take weeks before she felt better. *Id*. June 2015 notes describe Cluck as "distraught and tearful" over loosing her LTD benefits. *Id*. at 1464. Back or leg pain is not mentioned. July 2015 notes establish that Cluck had a medical procedure performed that required her to keep her left shoulder against a table for an extended period of time. *Id*. at 1462. Since the procedure, Cluck had been experiencing neck, chest, upper arm, shoulder, and upper back pain on her left side. *Id*. Dr. Taylor found Cluck to be in "obvious

distress" and diagnosed Cluck with exacerbation of fibromyalgia. *Id*. Dr. Taylor maintained Cluck's medication regimen. *Id*.

Dr. Wood performed Cluck's parathyroidectomy in August 2015. *Id*. at 1487. Dr. Wood's preoperative examination notes describe Cluck's "fibromyalgia well controlled and optimized for elective surgery." *Id*. at 1524. Post-surgery, Dr. Wood referred Cluck to Darryl Willett, M.D., an otolaryngologist. *Id*. at 1486.

Unum obtained Cluck's records from Dr. Willett. *Id*. at 1541. Dr. Willett performed parathyroidectomy revision surgery on Cluck in November 30, 2015 and indicated that Cluck could not work for one week afterwards. *Id*. at 1553. Dr. Willett stated the parathyroidectomy did not pertain to Cluck's back and leg pain. *Id*. at 1547, 1561.

Dr. Hauser reviewed the updated medical records from Drs. Taylor, Wood, and Willett as well as all other information in Cluck's file before completing his October 9, 2015 report. *Id*. at 1592-98. Dr. Hauser concluded that Cluck's fibromyalgia symptoms "are to a large extent focal (if migratory) and thus not consistent with the more generalized pain associated with fibromyalgia." *Id*. at 1597. As to Cluck's back pain, Dr. Hauser opined that Cluck's "physical examinations d[id] not reveal dermatomal (sensory) or myotomal (motor deficits consistent with radiculopathy." *Id*. He determined that Cluck's "straight leg raise test findings are highly variable and thus of doubtful clinical significance." *Id*. He questioned why Cluck was not prescribed Oxycodone and concluded "[t]his would reflect submaximal utilization of the most potent analgesic in the claimant's

regimen." *Id*. at 1597. His final report listed the question presented and his

response to same:

> "Would the Insured have the functional capacity to
> perform occasional exertion up to 10 pounds, performed from a
> seated position with occasional standing and walking
> with the ability to change positions as needed on a full time
> basis?" The information contained in the file does not support Rs
> and/or Ls that would preclude the claimant from performing the
> demands specified above.
> o Physical examinations do not reveal deficits that would
> preclude the claimant from performing the demands specified
> above.
> o Diagnostic studies do not reveal abnormalities that would be
> likely to cause or otherwise be associated with symptoms of the
> severity reported by the claimant.
> o Symptoms and limitations reported by the claimant are not
> consistent with or corroborated by physical examination and
> diagnostic test findings.
> o The various and variable symptoms reported by the claimant
> cannot be confidently attributed to spondylosis, radiculopathy,
> or fibromyalgia.

*Id*. at 1598. Because Dr. Hauser disagreed with Dr. Taylor, he referred Cluck's file

to Dr. Sentef for another review. *Id*.

### 2. Dr. Sentef's Opinion

Joseph Sentef, M.D., an Unum employee who is board certified in family,

occupational and public health medicine, likewise considered the entirety of Cluck's

file to determine whether he agreed with Dr. Hauser's conclusion. *Id*. at 1604. Dr.

Sentef's October 19, 2015 report found as follows relative to Cluck's back pain:

> MRI of the lumbar spine on 10/15/08 revealed mild facet
> hypertrophic spurring at L2-3, minimal disc protrusion
> and prominent facet hypertrophic spurring up to L3-4
> with facet hypertrophic spurring at L4-5 and L5-Sl. There
> is no significant spinal cord or nerve root compression.
> EMG/nerve conduction study of the lower extremities

16

> dated 11/21/08 was unremarkable with no evidence of
> radiculopathy, plexopathy or neuropathy. Physical exams
> have not revealed any neurological deficits. Reflexes have
> been bilaterally equal. Strength and sensation have been
> intact. A straight-leg raising test was positive on the left
> at 45° on 3/26/14. Straight leg raising test with Dr. Taylor
> on 3/9/15 was negative. Overall, there is no evidence of
> cord or nerve root compression. EMG/NCS reveals no
> evidence of radiculopathy, plexopathy or neuropathy. No
> neurological deficits have been documented. The claimant
> would be able to perform a sedentary occupation
> secondary to her back pain.

*Id*. at 1605. Dr. Sentef concluded similarly with respect to Cluck's fibromyalgia by

stating that condition did not preclude sedentary work. Dr. Sentef concurred with

Dr. Hauser's opinion because:

> The claimant has complained of low back pain but
> physical exams have essentially been normal with no
> evidence of neurological deficits. Reflexes have been
> bilaterally equal. Strength and sensation have been
> intact. Imaging including MRI of the lumbar spine does
> not reveal any evidence of cord or nerve root compression.
> EMG/nerve conduction study was unremarkable with no
> evidence of radiculopathy, plexopathy or neuropathy.
> The claimant also has a history of fibromyalgia
> with documented positive trigger points. Cornerstone
> treatment for fibromyalgia includes water aerobics along
> with lifestyle changes including diet, exercise and sleep
> hygiene. Increased activity is the norm for those
> individuals with fibromyalgia rather than decreased
> activity. Fibromyalgia does not preclude sedentary work.

*Id*. at 1605. Dr. Sentef thus concluded that "the information in the file does not

support restrictions and limitations precluding the claimant from occasionally

exerting up to 10 pounds of force, occasionally standing and walking, and sitting for

most of the workday with the ability to change positions as needed on a full-time

basis." *Id*. at 1604-6.

17

### 3. Unum Upholds its Decision

On October 23, 2015, Unum notified Cluck via letter that her appeal was denied and LTD benefits remained terminated. *Id.* at 1609. The letter stated that Cluck's fibromyalgia, back pain, or parathyroidectomy did not preclude her from performing sedentary work. *Id.* at 1610-11. The letter further stated that two physicians (Dr. Hauser and Dr. Sentef) had reviewed Cluck's file and determined that Cluck was not precluded from "occasional exertion up to ten pounds, performed from a seated position with occasional standing and walking with the ability to change positions as needed on a full time basis." *Id.* at 1611. The letter informed Cluck that Unum had transferred her file to Unum's "[a]ppeals [d]epartment for a separate appeals review" of her claim. *Id.*

### D. Unum's Second Appeals Review

Cluck did not submit any supporting documentation in response to Unum's October 23, 2015 letter. *Id.* at 1670-72. After re-reviewing Cluck's file, Unum upheld its decision to terminate Cluck's LTD benefits a second time on January 21, 2016 via a letter to Cluck from Kathleen Reid, a Lead Appeals Specialist with Unum. *Id.* at 1666-76. The January 2016 letter summarized Cluck's medical records from 2008, the appeals history, Dr. Hauser's opinion that Cluck could perform sedentary work, and Dr. Sentef's concurrence with that opinion. *Id.* at 1678-84.

### E. Litigation

This diversity case followed. The Complaint asserts claims for breach of contract for Unum's termination of Cluck's LTD benefits and for bad faith relative

18

to Unum's termination decision. (ECF No. 1.) Cluck seeks damages in excess of $300,000. *Id*. Unum denies both claims. (ECF No. 3.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some

19

metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## III. ANALYSIS

Cluck moves for summary judgment on her breach of contract claim (Count I) as to liability only. (ECF No. 40.) Unum moves for summary judgment on Cluck's bad faith claim (Count II). (ECF No. 41.)

### A. Governing Law

Cluck's Complaint makes no mention of ERISA. Nor could it. Section 29 U.S.C. §1003(b)(1) establishes an exemption for "governmental plans"; that subsection says that the provisions of ERISA do not apply to "any employee benefit plan if - (1) such a plan is a governmental plan (as defined in section 1002(32) of this title)." A "governmental plan" is defined in 29 U.S.C. §1002(32) as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." The Ohio State University is an agency or instrumentality of the State of Ohio. *Dunham v. Unum Grp*., No. 2:13-cv-0794, 2015 U.S. Dist. LEXIS 151080, at *8-9 (S.D. Ohio Nov. 6, 2015)(Kemp, M.J.). Therefore, the Policy which covered Cluck was a governmental plan. *Id*. (citing *Eschleman v. UnitedHealth Group*, *Inc*., No. 2:12-cv-519, 2013 U.S. Dist. LEXIS 128957, 2013 WL 4832066 (S.D. Ohio Sept. 10, 2013)(Marbley, J.)(employee benefit plan covering employees of the State of Ohio is an exempt governmental plan)). Hence, Ohio law, not ERISA, governs this dispute. *Dunham*, 2015 U.S. Dist. LEXIS 151080, at *8-9.

Cluck makes a weak argument to prevent this result. Specifically, she argues that ERISA law should apply because a section of the Policy indicates that ERISA applies to appeals procedures. (ECF No. 52, PageID 2302 n.2.) But the referenced section does not say that. Rather, that section provides "[*i*]*f* this policy provides benefits under a Plan which is subject to . . . (ERISA), the following [appeal]

21

procedures apply." (ECF No. 36-1, PageID 1901)(emphasis added). As noted above, the Policy is not subject to ERISA. Thus, Cluck's argument is without merit and application of Ohio law is proper.

### B. Breach of Contract

In Count I, Cluck alleges that Unum breached her disability insurance contract because "all of the medical evidence points in one direction—that Cluck was and remains disabled. . . ." (ECF No. 40, PageID 2142.) Unum responds that genuine disputes about material facts exist precluding judgment on this claim. (ECF No. 53, PageID 2334.) Cluck also argues Unum breached the contract by failing to have her undergo a physical examination. (ECF No. 40, PageID 2143.) Unum counters it was not required to do so under the Policy. Unum's arguments prevail on both grounds.

### 1. Overview

For this count, the ultimate question is not whether Unum "made a good or a bad decision based on what it had available for review;" rather, the query is whether a triable issue of fact exists as to if Cluck "met the contractual requirements for disability under the plan." *Dunham*, 2015 U.S. Dist. LEXIS 151080, at *9-10.

"An insurance policy is a contract, the interpretation and construction of which is a matter of law." *Keyser v. Unum Life Ins. Co. of Am.*, No. C2-03-138, 2005 U.S. Dist. LEXIS 48961, at *16-17 (S.D. Ohio Sep. 12, 2005)(Sargus, J.)(citation omitted.) "[I]nsurance contracts must be construed in accordance with the same

rules as other written contracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 665 (Ohio 1992)(citations omitted).

To recover for breach of contract, Cluck must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 10, 2002-Ohio-443, 771 N.E.2d 874 (10th Dist. 2002)(quotation and citation omitted). The parties agree that a contract existed. They disagree as to the remaining elements. Finding that there are genuine issues of material fact about defendant's breach, the Court refrains from addressing the remaining aspects of contention for this claim.

The breach element requires Cluck to prove that Unum "did not perform one or more of the terms of a contract." *Little Eagle Props. v. Ryan,* 10th Dist. Franklin No. 03AP-923, 2004-Ohio-3830, ¶ 15. In particular, Cluck must establish that Unum breached the contract by terminating her disability benefits if she was disabled, as that term is defined in the Policy, at the time benefits were terminated. *See Keyser*, 2005 U.S. Dist. LEXIS 48961, at *18. That is, Unum breached the contract if Cluck was not working and could not "perform the duties of any gainful occupation for which [she was] reasonably fitted by education, training or experience" when termination occurred. (ECF No. 30-1, PageID 292.)

## 2. Disability

Cluck attempts to satisfy her burden of proof by pointing to three separate reports dated four years after Unum terminated her benefits and obtained for the purposes of this litigation. Unum initially counters that those expert reports are

irrelevant because of the passage of time between termination and examination. On

that point:

> The question which the jury must determine, of course, is what symptoms and limitations [Cluck] suffered during th[e] [requisite] period. A later examination might or might not shed light on that question, but just because someone sees a doctor days or months after a certain date does not mean the doctor cannot have a valid opinion as to the condition prior to that date, or at least an opinion to the effect that if the patient says the condition has remained the same for a long period of time - something a jury would be entitled to hear and to evaluate - the condition limited the patient's ability to work just as much when it first developed as it did when [s]he finally saw the doctor. This is really an argument about the weight of the evidence, which is normally an issue for the jury . . . .

*Dunham*, 2015 U.S. Dist. LEXIS 151080, at *16.

Cluck's first expert proffer is an April 2019 functional capacity evaluation

performed by occupational therapist Scott Secrest. Secrest was retained by Cluck's

counsel to assess Cluck's "safe physical capacity and her feasibility for competitive

employment." (ECF No. 38-3, PageID 2011.) Secrest noted that Cluck "provided a

sincere effort" during the examination while concluding that her "performance and

presentation [we]re typical of and [we]re consistent with" her diagnoses of "T6

Wedge Compression Fracture, Degenerative Disc Disease, Fibromyalgia, Attention

Deficit Hyperactivity Disorder, Migraine Headaches, Depression and Neuropathy."

(ECF No. 38-3, PageID 2011-12.) He determined that she demonstrated a: (1) "poor

ability to sustain most functions," and (2) "material handling ability at a sub-

sedentary level as she [wa]s not able to meet demands for sedentary shoulder-level

lifting." *Id.* at 2012. He stated "most sedentary vocations require constant sitting ability. Conversely, Ms. Cluck [wa]s unable to sustain any constant postures, and w[ould] require frequent opportunities, at will, to make positional adjustments." *Id.* He noted "[s]uch accommodation in most competitive vocational environments is unreasonable. Thus, in my professional opinion, her competitive vocational ability is marginal, at best" and he could not "confidently recommend her for competitive employment, even at a sedentary level." *Id.*

Unum presents the report of Lisa Fitzpatrick, DrOT, to rebut Secrest's evaluation. (ECF No. 45-1, PageID 2246.) Therein, she attacked the evaluation's validity by: (1) noting that Secrest used an outdated variance model; (2) finding Secrest's conclusions as to Cluck's functional abilities to be conflicting; and (3) describing the factual basis for Secrest's determinations as lacking. *Id.* at 2248. She wrote:

> [Secrest] states [Cluck's] material handling ability is at a sub-sedentary level, however it appears that she was able to safely lift and carry 10 pounds. The sedentary classification states sedentary work involves lifting no more than 10 pounds and occasionally lifting and carrying articles or files for work - Code of fed [sic] regulations [sic] 404-1567 – SSA. During the evaluation the client also exhibited the ability to lift up to 15 pounds. This can be found on page 8 of the report under the percent of industrial standard rating chart where the client was measured carrying 15 pounds. In addition, the client also states that her max lifting carrying is approx. 10# on occasional basis which also falls into the sedentary classification. Objective measures of the client's range of motion appear within functional limits except for thoracic lumbar spine. She is also measured with 4 out of 5 for muscle testing which is considered good, and 5 out of 5 in

> foot and ankle muscle testing which is consistent with
> normal strength.

(ECF No. 45-1, PageID 2248.) Ultimately, Dr. Fitzpatrick determined that Cluck

could perform sedentary work involving lifting no more than 10 pounds and

occasionally lifting and carrying articles or files. *Id.* at 2248-9. Material disputes

therefore exist as to whether Cluck was and is disabled under the Policy and as to

the proper methods to be used when measuring capacity.

The second report upon which Cluck relies is from Alexander Minard, M.D., a

non-treating physician who examined her in May 2019 at the request of her counsel

for this case. (ECF No. 38-2.) Dr. Minard reviewed Cluck's records from Dr. Taylor

and Secrest's April 2019 functional capacity evaluation. He did not review Unum's

claim file. Dr. Minard concluded:

> I do believe that Barbara Cluck is totally and
> permanently disabled. She is not able to walk without an
> assistive device and is a significant fall risk in any work
> environment. She is not able to sit or walk for periods of
> time consistent with any work environment. She is not
> able to do any repetitive activity with her upper limbs. All
> of this results in a situation where she is not employable
> even in a sedentary capacity.

(ECF No. 38-2, PageID 2007.)

In response, Unum retained Dr. Cremer to provide a "Consulting Opinion

Related to Ability of Participate in Gainful Occupation" for Cluck. (ECF No. 43-1,

PageID 2215.) Physiatrist Stephen Cremer, M.D., in contrast to Dr. Minard,

reviewed the entirety of Cluck's medical records. *Id.* at 2215-21. Dr. Cremer

concluded that the "irregularity of the reports and severity of [Cluck's stated] pain

26

did not match the physiologic findings by imaging, electrodiagnostics, or laboratory studies." *Id*. at 2222. Furthermore, Dr. Cremer opined that Dr. Minard failed to "relate a level of functional limitation to physical conditions demonstrated objectively in the spine or peripheral nervous system." *Id*. at 2223. And, Dr. Minard noted that Secrest's report "did not completely rule out sedentary work." *Id*. at 2222. Consequently, the experts also have competing opinions as to whether the results of Cluck's tests and examinations support her claimed pain as well as her ability to complete sedentary work.

The third and final report Cluck relies upon to establish Unum's breach is authored by vocational rehabilitation specialist Joseph Atkinson. Atkinson performed a "vocation assessment" of Cluck on April 20, 2019 at her counsel's request. (ECF No. 38-1, ¶ 4.) Atkinson focused on Cluck's "ability to return to work in a gainful occupation based upon her physical work capacity, vocational and educational history and the labor market." (ECF No. 38-1, PageID 1999.) Before conducting his assessment, he reviewed Cluck's medical records from Dr. Taylor, Dr. Hauser's file review, Dr. Sentef's file review, and other pertinent documents. Atkinson described Cluck's impairments as "permanent." *Id*. at 2000. Ultimately, he disagreed with Potenzo's June 2015 analysis which found Cluck able to perform the duties of General Clerk, Receptionist, and Information Clerk. He reasoned that those jobs would not allow Cluck to change positions "as needed," which was the work capacity Unum used for Cluck. *Id*. at 2001. Accordingly, he concluded that

Cluck was "disabled for any occupation according to the plan documents." *Id*. at 2002.

Unum returned to Potenzo to rebut Atkinson's report. (ECF No. 44-1, Page ID 2233, 2235.)  Potenzo's resultant November 2019 vocational assessment stated that Atkinson's conclusion relied upon an outdated and incomplete version of the Dictionary of Occupational Titles from 1989 as to the occupation of General Clerk. *Id*. at 2235. Using the correct version from 2015, she reasoned, more accurately depicted the position's duties in light of technological advances. *Id*. at 2235. She also disputed Atkinson's conclusions that the occupations she found suitable for Cluck's restrictions prevented Cluck from changing positions "as needed." *Id*. at 2236. She wrote that each occupation allowed Cluck to take "micro-breaks" that would not affect work flow. *Id*. at 2237.

In sum, Cluck argues that the opinions of Dr. Taylor, Secrest, Dr. Minard, and Atkinson establish a lack of genuine dispute of material fact as to whether Cluck is disabled under the Policy. (ECF No. 40, PageID 2143.) Unum responds that its contrasting expert reports from Dr. Fitzpatrick, Dr. Kramer, and Potenzo generate genuine disputes of material fact about that issue. The dueling aspect of the reports is apparent. Consequently, because the evidence is in genuine and material dispute regarding whether Cluck was and is unable to perform "each of the material duties of any gainful occupation for which [she was] reasonably fitted by training, education or experience," Plaintiff's partial Motion for Summary

Judgment on the breach of contract claim based upon her expert reports is **DENIED**. (ECF No. 40.)

### 3. Examination

Cluck asserts that Unum breached the contract by failing to have her examined by a doctor of Unum's choice. (ECF No. 40, PageID 2143.) But the Policy did not require Unum to order an examination of Cluck. The Policy states that Unum "*may* require [Cluck] to be examined by a physician, other medical practitioner and/or vocational expert of [Unum's] choice." (ECF No. 30-3, PageID 1639)(emphasis added.). The Policy's permissive language renders this argument for judgment unavailing, and Cluck's partial Motion for Summary Judgment on Count I is **DENIED**. (ECF No. 40.)

### C. Bad Faith

Count II alleges that Unum denied Cluck's LTD claim in bad faith. Unum argues it acted reasonably as a matter of law when terminating Cluck's LTD benefits and that Cluck fails to produce evidence of bad faith. Consequently, Unum seeks summary judgment on this count. (ECF No. 41.) The Court determines that summary judgment in Unum's favor is proper.

### 1. Analytical Framework

"[A]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 276 (1983). In this regard:

> [A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor. An insurer's lack of good faith in the processing of a claim is frequently referred to as bad faith. Bad faith conduct gives rise to a cause of action in tort against the insurer. Inasmuch as the breach of the duty to act in good faith is tortious in nature, punitive damages may be recovered against an insurer who breaches his duty of good faith in refusing to pay a claim of its insured upon adequate proof.
>
> An insurer lacks reasonable justification for denying a claim when its refusal to pay is predicated on an arbitrary or capricious belief that the insured is not entitled to coverage. A court may properly grant summary judgment to an insurer on a claim of bad faith, however, where the record is devoid of any evidence tending to show a lack of good faith.

*Keyser*, 2005 U.S. Dist. LEXIS 48961, at *24 (internal citations and quotations omitted). Thus, the key inquiry is whether "'the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial,' not whether the insurance company's decision to deny benefits was correct." *Id.* (quoting *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992)).

The arbitrary and capricious standard is "the most deferential standard of judicial review." *Ohio Bell Tel. Co. v. PUC of Ohio*, 711 F.3d 637, 641 (6th Cir. 2013). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citation omitted). A decision need only be "rational in light of the plan's provisions" to satisfy the arbitrary or capricious standard. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (quotation omitted)).

"To grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith, a court must find, after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Keyser,* 2005 U.S. Dist. LEXIS 48961, at *24 (citing *Tokles & Son. Inc. v. Midwestern Indem. Co.*, 65 Ohio St. 3d 621, 630-31 (Ohio 1992)(overruled in part on other grounds by *Zoppo v. Homestead Ins. Co.*, 1994-Ohio-461, 71 Ohio St. 3d 552, 552)). To survive a summary judgment motion on a bad faith claim, Cluck must present evidence tending to show that Unum had no reasonable justification for terminating her claim. *Keyser,* 2005 U.S. Dist. LEXIS 48961, at *24 (citing *Tokles*, 65 Ohio St. 3d at 630-31). Intent, however, "is not and has never been an element of the reasonable justification standard." *Zoppo*, 71 Ohio St.3d at 555.

## 2. Analysis

Although Cluck's Complaint asserts seven separate bases for her bad faith count, she defends only two in her opposition to Unum's Motion for Summary Judgment. Accordingly, she has abandoned the undefended claims. *Chic Promotions, Inc. v. Jewelers Mut. Ins. Co.*, No. 1:07cv417, 2009 U.S. Dist. LEXIS 87930, at *5-6 (S.D. Ohio Sep. 24, 2009)(Barrett, M.)(citing cases); *see* ECF No. 1, ¶ 35; *see also* ECF No. 52. After Cluck's Supplemental Memorandum in Opposition to Unum's Motion for Partial Summary Judgment, left in issue are Cluck's bad faith

31

allegations that Unum: (1) failed to adequately investigate Cluck's LTD claim; (2) relied, unreasonably, on its in-house medical reviewers; and (3) placed its own business interests ahead of the interests of its insureds. (ECF Nos. 52 and 99.)

### a. Investigate

Cluck argues that Unum's investigation was inadequate because Unum failed to "investigate [its] mistaken assumptions about Cluck's condition," to "follow Unum's procedures," and "relied on the medical judgment of a claims handler who had no medical training." (ECF No. 52, PageID 2313.) As such, she argues Unum had no reasonable justification for terminating her benefits.

Turning first to the failure to investigate Cluck's condition, Cluck argues that Unum terminated her claim "not after a thorough investigation, but based upon its employees' mistaken assumption that Cluck's lack of treatment with specialists reflected medical progress." (ECF No. 52, PageID 2314.) The Court's extensive background section details that Unum sought, obtained, and considered medical records from every single doctor Cluck saw. Unum had a functional capacity evaluation, a vocational assessment and two separate board-certified physician reviews of Cluck's file performed before deciding to terminate her benefits. Unum's investigation was undoubtedly thorough. As to Cluck's mistaken assumption contention, she provides mere speculation, not evidence. In contrast, Mercier testified that Unum viewed Cluck's failure to treat with specialists as evidence discounting Cluck's claimed high pain levels. (ECF No. 35-1, PageID 1777.)

32

Cluck further argues Unum failed to contact Dr. Taylor to confirm that mistaken assumption. Yet, the record is clear that Unum contacted Dr. Taylor on multiple occasions to obtain information relative to Cluck's treatment. *See* ECF No. 30-3, PageID 1384-85. Cluck also argues that Unum's failure to order an IME is evidence of bad faith. *Id.* To repeat, the Policy did not require Unum to do so. And, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005).

Cluck's argument as to Unum's purported failure to follow its own policies is premised upon the application of ERISA law to this case. For the reasons discussed above, ERISA is inapplicable.

Cluck's final evidence of bad faith under this category is her contention that Unum improperly relied upon Kathleen Reid, who had no medical training, to make the final call as to the termination of Cluck's benefits. (ECF No. 52, PageID 2314; ECF No. 36-1, PageID 1824.) Reid testified that she reviewed the entirety of Cluck's file before reaching her determination. (ECF No. 36-1, PageID 1828, 1830.) The file included, *inter alia*, Dr. Hauser's and Dr. Sentef's reviews, Potenzo's vocational assessment, and Mercier's 2015 functional capacity report. *Id.* Reid testified that she "relied on [her] medical resources to interpret the medical information." *Id.* at 1831. Reid's reliance on the opinions of medical professionals who had extensive and relevant training when reaching her decision is reasonable and not evidence of bad faith. *See id.* at 1828-31, 1833. What Cluck truly takes issue with is not Reid's

33

reliance on medical professionals but whom she relied upon. That is, Cluck would have had no problem if Reid relied on Dr. Taylor's opinion to determine that Cluck remained disabled under the Policy. Mere disagreement with a decision does not constitute bad faith.

In sum, considering the evidence in Cluck's favor, and applying the arbitrary and capricious level of review, Cluck has not presented evidence tending to show that Unum had no reasonable justification for terminating her claim.

### b. In-house Reviewers

Cluck next argues that Unum relied on the opinions of Mercier, Dr. Hauser and Dr. Sentef in bad faith. In support, Cluck highlights that Mercier determined in 2013 and 2014 during roundtable discussions about Cluck's file that Cluck was disabled under the Policy before finding in 2015 that she was not disabled. Describing the change in opinion as "spurious," Cluck argues that Mercier's reason for the change was that Cluck had stopped treating with specialists. (ECF No. 52, PageID 2316.) But Mercier testified that the lack of specialist treatment was "only one aspect" of why she concluded in 2015 that Cluck's disabling restrictions were not supported. (ECF No. 35-1, PageID 1778.) Mercier said she also relied upon Cluck's "unremarkable" physical exam findings. *Id*. Furthermore, Mercier's 2013 and 2014 decisions were partially premised on Cluck's lack of health insurance. Cluck secured health insurance in March 2015 which enabled her to pursue specialist treatment. Additionally, Mercier's 2013 and 2014 comments were not based on a lengthy clinical review like her June 2015 report was. Under these

circumstances, and cognizant of the arbitrary and capricious level of review, Cluck's reliance upon Mercier's changing opinions as evidence of bad faith is insufficient.

Cluck's bad faith reliance argument about Dr. Hauser is that he made "little effort" to consult with Dr. Taylor about Cluck's fibromyalgia. (ECF No. 52, PageID 2316.) Yet, Dr. Hauser sought, obtained, and considered Dr. Taylor's opinion. Cluck's contention that Dr. Hauser's communication with Dr. Taylor shows bad faith is incorrect.

Cluck argues that Unum's reliance on Dr. Sentef's opinion was in bad faith because Unum only asked him if he agreed with the restriction determination of Dr. Hauser or Dr. Taylor. *Id*. As Unum states, this is a distinction without a difference. Asking whether Dr. Sentef agreed with the other doctors is the same as asking for his opinion on whether Cluck had disabling restrictions.

Reviewing the facts in a light favorable to Cluck while applying the arbitrary and capricious review standard yields the determination that Cluck failed to present evidence that Unum's reliance on the opinions of Mercier, Dr. Hauser, and Dr. Sentef was in bad faith.

### c. Business Interests

Cluck's final ground supporting her bad faith claim is that Unum "systematically placed its own business interests ahead of the interests of its insured," such that Unum terminated her benefits in bad faith due to financial pressure. (ECF No. 99, PageID 2626.)  To bolster this contention, Cluck argues that Unum lost money on its Policy with Ohio State from 2010 to 2013. *Id*. at 2628.  In

an attempt to stem that tide and "drive down" the number of claims, Cluck asserts that Unum enlisted the help of its claims staff to increase the participation of the Policy's insureds in Unum's transitional return-to-work program. *Id*. at 2631. According to Cluck, all of this admittedly circumstantial evidence could lead the jury to conclude that Unum's financial losses and desire to reduce claims was the true and bad faith reason for its termination of Cluck's benefits. *Id*. at 2633.

The Court agrees with Unum that merely operating a transitional work program does not equate to bad faith. (ECF No. 107, PageID 2947.) Moreover, the program and any affect it may have had on claims numbers is irrelevant, as Cluck did not participate in the program. Additionally, the mere fact that Unum lost money on its OSU business years before Cluck's benefits were terminated does not connect with Unum's decision to terminate Cluck's specific claim.

Neither Unum's financial deficit nor its maintenance of a transitional return-to-work program that Cluck did not take part in show bad faith on Unum's part. Considering the evidence in Cluck's favor, and applying the arbitrary and capricious level of review, she has not presented evidence creating a genuine issue of material fact that Unum had no reasonable justification for terminating her claim. As such, Unum's Motion for Summary Judgment on Count II is **GRANTED**. (ECF No. 41.) All relief related to this claim is therefore unavailable.

## IV. **MOTION TO SEAL**

Lastly, Unum seeks an Order: (1) maintaining the sealed status of Exhibits A and B to Plaintiff's Supplemental Memorandum in Opposition to Defendant's

Motion for Partial Summary Judgment (ECF No. 99); (2) keeping Exhibits A-1b, A-2, and A-3 of Unum's Reply (ECF Nos. 105, 106) under seal; and (3) requiring redaction of references to Exhibits A, B, A-1b, A-2 and A-3 in publicly filed documents. *See also* ECF Nos. 98, 102.

The data contained in Exhibit A "constitutes confidential financial information related to [the] Policy. . ., which Unum issued to The Ohio State University ("OSU"), including the case reserves from year to year, the total premiums paid, revenue data, the monthly indemnity incurred, and financial calculations." (ECF No. 77, PageID 2503)(citation omitted). Exhibit B includes "an email string and chart that discusses Unum's rates with OSU, the tolerable loss ratio, and the trend regarding incidence of LTD claims." (ECF No. 102, PageID 2671.) Exhibit A-1b is a 2013 Long-Term Disability Renewal Executive Summary. (ECF No. 106-1.) It discusses Ohio State's premium contributions to the Policy. It contains confidential financial computations. Exhibit A-2 is a confidential email discussing appropriate pricing for Ohio State's 2010 LTD and short-term disability plans. (ECF No. 106-2.) Exhibit A-3 is Unum's 2014 renewal analysis for the Policy. (ECF No. 106-3.) It details Unum's confidential rate calculations, loss and growth evaluations, and LTD plan design options.

Unum argues that keeping each of these exhibits under seal and references to them redacted is necessary to maintain the confidential nature of that data and to prevent the disclosure of information which would place Unum in a competitive disadvantage. (ECF No. 102, PageID 2671.) Unum contends that its motion is

narrowly tailored and granting its requested relief would result in sealing thirty pages of a record that spans more than 2,000 pages. Cluck opposes, arguing that Unum's competitive disadvantage contention is insufficient to overcome the public's strong interest in "understanding the evidence underlying the Court's decision." (ECF No. 104, PageID 2888-90.) Unum's Reply re-frames its original arguments to respond to Cluck's opposition. (ECF No. 108.)

Magistrate Preston Deavers previously addressed whether Exhibits A and B should be sealed. (ECF No. 77.) Her well-reasoned Order, which the Court incorporates by reference herein, details the correct analytical framework to address the seal request as follows:

> It is well established that "[e]very court has supervisory power over its own records and files." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). A court's discretion to seal records from public inspection, however, is limited by "the presumptive right of the public to inspect and copy judicial documents and files[,]" which the United States Court of Appeals for the Sixth Circuit as described as a "long-established legal tradition." *In re Knoxville NewsSentinel Co., Inc.*, 723 F.2d 470, 473–74 (6th Cir. 1983); *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178–80 (6th Cir. 1983) (discussing the justifications for the "strong presumption in favor of openness"). Therefore, "[o]nly the most compelling reasons can justify non-disclosure of judicial records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (internal quotation marks and citation omitted). The Sixth Circuit has indicated that exceptions fall into two categories: (1) exceptions "based on the need to keep order and dignity in the courtroom"; and (2) "content-based exemptions," which "include certain privacy rights of participants or third parties, trade secrets, and national security." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179 (citations omitted).

38

In addition, the Sixth Circuit has recently emphasized the public's "strong interest in obtaining the information contained in the Court record." *Shane Grp., Inc.*, 825 F.3d at 305 (internal quotation marks and citation omitted); *see also In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 939 (6th Cir. 2019) ("'[T]he greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access.'") (quoting *Shane Grp., Inc.*, 825 F.3d at 305). Accordingly, district courts must consider "each pleading [to be] filed under seal or with redactions and to make a specific determination as to the necessity of nondisclosure in each instance" and must "bear in mind that the party seeking to file under seal must provide a 'compelling reason' to do so and demonstrate that the seal is 'narrowly tailored to serve that reason.'" *In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 940 (quoting *Shane Grp.*, 825 F.3d at 305). If a district court "permits a pleading to be filed under seal or with redactions, it shall be incumbent upon the court to adequately explain 'why the interests in support of nondisclosure are compelling, why the interests supporting access are less so, and why the seal itself is no broader than necessary.'" *Id.* (quoting *Shane Grp., Inc.*, 825 F.3d at 306).

Applying that framework to Exhibits A and B, Magistrate Preston Deavers decided:

Here, the Court finds that the public has some interest in this action; however, the information sought to be sealed is not of great interest to the public and is highly proprietary to Defendant Unum Life Insurance Company of America ("Unum"). The seal relates to two pages from Unum's produced discovery and concerns Plaintiff's specific allegations as set forth in her motion to re-open discovery. As such, the seal is narrowly tailored to the issues in this lawsuit. Further, a compelling reason supports the seal because the data contained in these two pages constitutes confidential financial information related to Group Policy 121156, which Unum issued to The Ohio State University ("OSU"), including the case reserves from year to year, the total premiums paid, revenue data, the monthly indemnity incurred, and financial calculations. (*See* Declaration of Brett Gruss ("Gruss Decl.") Exhibit A, at ¶ 3.) Companies have a

> compelling interest in protecting such information from
> their competitors especially when disclosure would cause
> a competitive disadvantage. *London Comput. Sys. v.
> Zillow Ind.*, No. 1:18-cv-696, 2019 U.S. Dist. LEXIS
> 147060, at *9 (S.D. Ohio Aug. 29, 2019); *see also The
> Proctor & Gamble Co. v. Ranir*, LLC, No. 1:17-cv-185,
> 2017 U.S. Dist. LEXIS 131141, at *10 (S.D. Ohio Aug. 17,
> 2017) (granting the motion to seal and redact documents
> containing sales information, business plans, and
> financial data).

*Id.* at 2501-03. The Court agrees with, adopts, and applies the logic espoused in the

Order as to Exhibits A, B, A-1b, A-2, and A-3. Hence, Unum's Motion to Seal is

**GRANTED**. Exhibits A, B, A-1b, A-2, and A-3 shall be sealed and references to

them in publicly filed documents shall be redacted.

## V.    CONCLUSION

Cluck's Motion for Partial Summary Judgment on Count I is **DENIED**. (ECF

No. 40).

Unum's Motion for Partial Summary Judgment on Count II is **GRANTED**.

(ECF No. 41.)

Unum's Motion to Seal is **GRANTED**. (ECF No. 102.)

This Opinion & Order is being filed under seal in the first instance. Counsel

shall confer and submit an <u>agreed</u> redacted version of this Opinion & Order to the

Court for filing. The Court does not anticipate any disagreement on such a simple

matter; if there is, areas of dispute shall be clearly marked with <u>short</u> descriptions

of the basis for objection provided. The proposed agreed redacted Opinion & Order

shall be e-mailed in Word format to Amy_Vogel@ohsd.uscourts.gov with all counsel

and *pro se* parties copied within ten (10) days of this Opinion & Order. Failure to abide by this deadline will result in this Opinion & Order being filed unsealed.

A scheduling order for the final pre-trial and jury trial will issue shortly.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**